# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| CHASE KEENEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 3:14-CV-0010 |
| ) | Judge Aleta A. Trauger |
| ) | |
| INGRAM BARGE COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

The defendant Ingram Barge Company ("IBC") has filed a Motion for Summary Judgment (Docket No. 57), to which the plaintiff, Chase Keeney ("Keeney"), has filed a Response in opposition (Docket No. 61), and IBC has filed a Reply (Docket No. 62). For the following reasons, the motion will be denied.

## FACTS AND PROCEDURAL BACKGROUND[1]

This case involves allegations by Keeney that he suffered a personal injury – specifically a back injury that required surgical intervention – while working as a seaman for IBC. IBC is a Tennessee corporation with a principal place of business in Nashville, Tennessee. Keeney is a resident of Alton, Missouri.

### I. Keeney's Work With IBC

Keeney was hired by IBC in July 2011 as an "inexperienced deckhand" and was

---

[1] Facts are drawn from IBC's Statement of Undisputed Material Facts (Docket No. 58), Keeney's Response thereto ("RSUMF") (Docket No. 61-18), Keeney's Statement of Undisputed Facts (Docket No. 61-2), IBC's Response thereto ("RASUMF") (Docket No. 62-1), and the evidentiary record as a whole.

1

ultimately promoted to "experienced deckhand." The M/V WILLARD HAMMOND, the boat on which Keeney was employed by IBC as a deckhand in October of 2012, is one of IBC's harbor tugs that works in the IBC fleet on the Mississippi River near Columbus, Kentucky, building tows of barges for IBC line boats that push barges on the Mississippi River.[2] Keeney was assigned to work his shifts with Josh Putty, another deckhand.[3] Keeney would receive orders from the captain that they had to pull a certain number of barges out of the fleet and build a tow of those barges for a line boat to pick up. Once the captain gave Keeney an order concerning which barge would be pulled from the fleet, Keeney's responsibility as deckhand was to face up (or connect) the boat to that barge and cut the wires (or cables) loose between the barge and the fleet. Once the barge was then free from the fleet, the boat pushed it into place in the tow being built. The deckhand(s) then connected the wires between the barge and the tow they were building. These tow building tasks can include carrying and jerking (or "laying") wire weighing 100 to 120 pounds, jerking a 60 to 70 pound ratchet, and hooking the ratchets into stationary links.

Keeney described what it means to "lay a wire" as follows: "Well, the wire itself is about 35-foot long and, you know, 100 to 120 pounds, and it's connected to a ratchet that weighs roughly 60 or 70 pounds. The wire is wrapped around different types of fittings on

---

[2] A full crew of the M/V WILLARD HAMMOND is 6 crew members, which is made up of 2 pilots (or captains) and 4 deckhands. The crew of the M/V WILLARD HAMMOND works 12 hour watches, with a pilot and two deckhands working each watch. The crew of the M/V WILLARD HAMMOND works 14 days on the boat and then returns home for 14 days.

[3] Putty had a history of poor performance dating back to 2006 and had received a number of poor ratings and corrective action reports. However, in the years recent to the October 2012 trip, he had received several positive reports, including a "meets expectations" review for the October 2012 trip itself. Putty was terminated by IBC in June of 2014.

the barges from one barge to another to tie the two barges together to keep from moving. Once the wire is wrapped around the fittings, you have to take and grab the ratchet and jerk the ratchet and the wire up to where there's no slack in the wire and then hook the ratchet into a set of links that are stationary to another fitting, and then you tighten the ratchet down." (Docket No. 61-19, p. 9.)

Keeney worked the day shift, from 5:30 a.m. until 5:30 p.m., for the 14 days that he was on the M/V WILLARD HAMMOND from October 2 until October 16, 2012. Keeney does not identify any specific incident during this time when he was injured and does not remember pulling any specific wire and feeling immediate pain in his back;[4] rather, he generally claims that he injured his back because he pulled wires by himself during this two-week trip. Keeney has admitted that there was nothing wrong with any barge on which he worked in October 2012 that caused his alleged injury. Keeney has also testified that (1) there was nothing wrong with the physical structure of the M/V WILLARD HAMMOND and (2) there was no specific piece of equipment, such as a ratchet or a wire, that caused his alleged injury.

Keeney's liability expert, Donald J. Green, has offered the following opinions in his expert report:

> 4.1. . . . the cause of this accident was negligence on the part of the defendants, Ingram Barge Company, for failure to provide Mr. Chase Keeney a safe workplace free from hazards. Reportedly, Mr. Keeney was required to perform repetitive heavy lifting and jerking ratchets to take out slack in "laying a wire" without assistance. These are functions that are typically performed by two persons working together when making tow or securing barges in a tow.

---

[4] Keeney's experts have opined that it is possible to develop pain in the future from a prior, discrete injury. This does not, however, create a dispute of material fact about whether Keeney felt immediate pain aboard the M/V WILLARD HAMMOND. (*See* RSUMF No. 16.)

> Mr. Keeney repeatedly handled heavy rigging wires and ratchets without sufficient assistance. Had another deckhand been available to help Mr. Keeney it is likely that he, Mr. Keeney, would not have had to repetitively strain laying wires making up tows, and it is more likely than not that this incident could have been avoided.
>
> 4.2 . . . Ingram Barge Company failed to provide proper supervision or instruction to Mr. Keeney regarding safe procedures for transferring rigging wires from barges to tow boats and other barges. Mr. Keeney testified: "I was doing the job of two men by myself a lot of the times where it takes two people to pull up a wire and strap it in, I was doing it all by myself." (Keeney deposition page 98, lines 8 -11). Requiring or allowing Mr. Keeney to work alone deploying or laying wires without assistance more than likely caused his injuries.
>
> 4.3 . . . the defendants failed to provide proper operational supervision, policies and guidance to its vessel operators by not requiring two (2) persons working together to deploy and lay wires in a tow. There is no evidence or information that Ingram Barge Company requires or directs deckhands to work in unison deploying or laying wires in a tow.
>
> 4.4 . . . the WILLARD HAMMOND was unseaworthy at the time of the incident for the reasons outlined above.

(Docket 61-9, pp. 3-4.) However, Green also testified at deposition that, in his experience, there is no actual requirement for two men to lay a wire together. The only written document addressing the task of laying wire is IBC's deckhand manual, which states that the task can be done "with one person or two." (Docket No. 61-25, p. 3.) Keeney testified that he had pulled wire by himself on the October 2012 trip and other trips hundreds of times and that he never refused to do it by himself.

Despite this testimony, however, it does appear that, if not mandated, it was at least preferable to have two men laying wire. Several of Keeney's crewmembers testified that towbuilding operations were to be done as a team. Keeney himself testified at deposition that he

4

reported to his captain, Larry Adams, that Putty was not helping him enough and that Adams responded, "[Putty] needed to get out there and help [Keeney] more and that [Keeney] didn't need to be out there by [him]self, and, you know, [Putty] would try to make the excuse that, oh, I've got stuff here to do on the boat and the pilot, he said, well you know, that's stuff that can be done at a different time or in, you know, when there's a slow time or when the boat's stopped, you know, not doing anything." (Docket No. 61-4, pp. 99-100.)

## II. <u>Keeney's Back Injury</u>

This is not the first time Keeney has experienced back pain. Keeney admitted in his deposition that he was in a car accident while intoxicated in 2008 or 2009, where the car ran off the road and rolled. In March 2009, Keeney reported to Mary Anne Vaughn, his family nurse practitioner, that the severity of his back pain was a 7 out of 10, and that, to help with the pain, he had a woman burn his arms with a cigarette to override it. Vaughn, who has a master's degree in nursing, sent Keeney for an x-ray, including of his lumbar spine, which had clear results. Vaughn has testified that she is not qualified to relate the injuries allegedly suffered by Keeney in October of 2012 to any pre-existing injury.

When he was hired by IBC, Keeney was required to, and did, submit certain medical information on a Medical Submission Form as a part of a required pre-employment physical. Because deckhand work is strenuous, IBC uses the Medical Submission Form to inquire into each deckhand applicant's prior back injuries, as such an inquiry is related to an applicant's ability to perform deckhand work. The questions that IBC asks in its Medical Submission Form regarding prior injuries, physical problems, and medical treatment – especially as they relate to the back – and the answers to those questions, are material to IBC's decision to hire every deckhand. Keeney signed his Medical Submission Form and dated it July 18, 2011. Keeney was

5

also given a pre-employment physical in Paducah, Kentucky, prior to being hired by IBC. The Medical Submission Form signed by Keeney answered "No" to the question of whether he had ever had back trouble. Keeney maintains that this answer was accurate because he was told by his nurse practitioner, Mary Anne Vaughn, that "nothing was wrong with him" after his x-ray results were negative. The Medical Submission Form signed by Keeney also answered "No" to the question of whether he had any prior injuries to his back, including soft muscle injuries, disc/vertebrae injuries, or neurological injuries. Again, Keeney maintains that his answer was truthful for the same reason.

Keeney completed and signed a boarding and separation report every time that he got on and off the boat. He has testified that he understood how to fill out these forms and that he was required to acknowledge on them any injuries he had suffered and if he had been sick. Keeney has admitted that he was aware that, if he had an injury, he needed to check the appropriate box on the form and fill in the reason. Throughout his employment with IBC, Keeney disclosed various things on his boarding and separation reports, such as a sore throat, a basic check-up with his doctor, and whether he was getting off the boat for medical relief or if it was his normal scheduled relief. When Keeney left the boat on October 16, 2012, he stated, by initialing the appropriate boxes on the boarding and separation report, that he was not injured on that trip on the vessel and that he was getting off the boat on his normal scheduled relief. In his deposition, Keeney admitted that he placed his initials in these boxes and signed the form dated October 16, 2012.[5]

---

[5] Keeney again notes that his treating doctors have opined that an injured individual can start to feel pain weeks later. However, this does not create a dispute of material fact as to Keeney's actions on October 16, 2012.

On October 17, 2012, the day after Keeney returned from working on the M/V WILLARD HAMMOND, Mary Anne Vaughn treated Keeney for back pain. On October 17, 2012, Keeney complained to Vaughn that he was experiencing lower back pain. Keeney's records reflect a reference to pain for three to four years.[6] Keeney reported to the medical center that he woke up in pain on the morning of October 17, 2012, as "this morn" is noted under "Onset" on the medical record from October 17, 2012. Keeney did not describe any type of work-related injury to Mary Anne Vaughn on October 17, 2012, at a follow-up appointment on November 9, 2012, or later. Keeney subsequently underwent two back surgeries.

Keeney's shipmate Anthony Natero testified that, a few days after the voyage, he received a text message from Keeney in which Keeney stated that he hurt his back getting out of bed. Natero specifically remembered that the text referenced Keeney injuring his back while at home, not while on the boat, and he has no memory of Keeney reporting any injury to him while on the boat. Keeney, on the other hand, testified that he complained to Natero of pain while on the boat on October 16th.

Dr. David Tomaszek, Keeney's treating neurosurgeon, opined that Keeney injured his back on the October 2012 voyage. Dr. Tomaszek testified that, based on Keeney's history, the records Dr. Tomaszek reviewed, and testing that was performed, Keeney "injured his back in October of 2012 causing the need for subsequent treatment" (*i.e.*, surgery). (Docket No. 61-13, p. 7.) In October of 2015, Dr. Zoran Cupic, Keeney's treating orthopedist, also opined "with all reasonable and medical probability that the symptoms that Mr. Keeney complains of are directly

---

[6] Keeney asserts that his father, who suffers from dementia, made this statement to Vaughn, not himself, and that Vaughn transcribed it incorrectly in the clinic records. Vaughn does not recall who made the statement.

7

related to the injury he sustained in October of 2012." (Docket No. 61-17, p. 2.)

Keeney filed the Complaint on January 3, 2014 (Docket No. 1) and an Amended Complaint on January 29, 2014 (Docket No. 14). He brings three claims: one for negligence under the Jones Act, 46 U.S.C. § 30104 (formerly 46 U.S.C. § 688), a second for unseaworthiness under general maritime law, and a third for maintenance and cure under general maritime law.

On February 12, 2016, IBC filed its Motion for Summary Judgment. (Docket No. 57.) On March 7, 2016, Keeney filed his Response. (Docket No. 61.) On March 14, 2016, IBC filed its Reply. (Docket No. 62.)

## **SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id*. (quoting

8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

As a threshold matter, citing to one case from the Fifth Circuit, the defendant contends that it is entitled to summary judgment because Keeney cannot definitely establish that he was injured as a result of an accident on the M/V WILLARD HAMMOND. But this case is not analogous. In *Glaze v. Higman Barge Lines, Inc.*, No. 13-6604, 2014 WL 5393355, at *1 (E.D. La. 2014), *aff'd* 611 F. App'x 227 (5th Cir. 2015), the plaintiff seaman claimed that he was injured while working on a boat in July or August of 2013. However, the exact date of his injury was unknown to him. *Id*. at *2. The plaintiff reported no injury in July or August of 2013 and denied any injuries at doctor's visits on August 30, 2013, September 5, 2013, and October 2 of 2013. *Id.* at *1. Suddenly, on October 22, 2013, the plaintiff applied for disability benefits, citing injuries sustained while "chipping with a needle gun." *Id*. At his deposition, the plaintiff was forced to admit that he could not have been injured on a number of the dates that he had claimed. *Id*. Furthermore, the plaintiff admitted that he had never reported the injury to a physician during the time he claimed to have been injured. *Id.* Accordingly, the district court in *Glaze* granted the defendant's motion for summary judgment on all of the plaintiff's claims, including those for negligence under the Jones Act and for unseaworthiness and maintenance and cure under general maritime law. *Id.* The court held that summary judgment was

9

appropriate because the plaintiff could not pinpoint when the alleged injury occurred, there was nothing to corroborate that an accident had occurred, and the plaintiff told his physicians that he did not have an accident and could not state a specific injury. *Id.*

Here, however, Keeney sought medical assistance the day after leaving the M/V WILLARD HAMMOND. While the factual circumstances of that assistance (*i.e.*, what Keeney stated to Vaughn) are in dispute, it is clear that Keeney sought treatment for an injury in close proximity to his trip on the boat. Keeney has also testified (again, disputedly), that he informed Natero while still on the boat that he was feeling the effect of an injury. But what Keeney has in this case that the plaintiff in *Glaze* did not have, clearly, is expert medical testimony that states the opinion that Keeney's injuries could have happened and *did* happen during the October trip on the M/V WILLARD HAMMOND. This is sufficient to create a question of material fact about whether Keeney's injuries were actually incurred onboard the boat. Reliance on *Glaze* is, therefore, misplaced.

**A.** **Jones Act**

The Jones Act, 46 U.S.C. § 30104, provides, in relevant part:

> A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.[7]

In order to recover under the Jones Act, a plaintiff must prove negligence (*i.e.*, duty and breach of that duty). *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598 (6th Cir. 2001).

---

[7] The Jones Act, 46 U.S.C. § 688, was repealed on October 6, 2006, but Congress added nearly identical language at 46 U.S.C. § 30104. *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 378 n.1 (6th Cir. 2008).

An employer's actions are judged under the 'ordinary prudence' standard. *Id.* It is the employer's duty "to provide a safe workplace for its employees." *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 449 (6th Cir. 2001). A plaintiff must show that his employer breached this duty "by neglecting to cure or eliminate obvious dangers of which the employer or its agents knew or should have known." *Id.* An employer must only "'protect against foreseeable risks of harm.'" *Perkins*, 246 F.3d at 599 (internal citations omitted). For this reason, "[t]here must be some evidence from which the trier of fact can infer that the owner either knew, or in the exercise of due care, should have known of the unsafe condition." *Id.* (internal citation omitted). Once a plaintiff has established negligence, he need not establish proximate causation. *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 907-08 (6th Cir. 2006). In order to establish a *prima facie* cause of action under the Jones Act, a plaintiff need only show that "the employer's negligence played any part, however slight, in producing the injury to the seaman." *Perkins*, 246 F.3d at 598.

In light of this "very low evidentiary threshold . . . for submission of Jones Act claims to a jury," *Rannals*, 265 F.3d at 447 (internal citation omitted), the Sixth Circuit has expressed its "reluctance to dispose of Jones Act claims through summary judgment." *Daughenbaugh v. Bethlehem Steel Corp.*, 891 F.2d 1199, 1207 (6th Cir. 1989). "[E]ven marginal claims are properly left for jury determination." *Id.* at 1205 (quoting *Leonard v. Exxon Corp.*, 581 F.2d 522, 524 (5th Cir. 1978)). A "[p]laintiff must offer 'more than a scintilla of evidence in order to create a jury question on the issue . . . but not much more.'" *Churchwell*, 444 F.3d at 903 (internal citation omitted); *see also* G. GILMORE & C. BLACK, THE LAW OF ADMIRALTY 311 (1957) ("It would be a rare court in an unusual case which would take the negligence issue away

from the jury.").

Here, Keeney relies, essentially, upon the fact that he was required to do a two-person job himself and, in the course of so doing, suffered an unnecessary injury. Keeney further contends that the operators of the M/V WILLARD HAMMOND were aware of these conditions because they knew that Putty was not assisting Keeney as he should. Keeney has the evidence of his liability expert, who has opined that (1) requiring or allowing Keeney to work alone deploying or laying wires without assistance more than likely caused his injuries, and (2) had another deckhand been available to help Keeney, it is likely that Keeney would not have had to repetitively strain himself laying wires while making up tows, and it is more likely than not that this incident could have been avoided.[8]

In response, IBC suggests that it is entitled to summary judgment because Keeney's injuries occurred solely during the performance of routine tasks. IBC cites *Rutherford v. Lake Michigan Contractors, Inc.*, 28 F. App'x 395, 398-400 (6th Cir. 2002), as an example of a case in which the Sixth Circuit found that lifting a steel cable was a task that could routinely and frequently be handled by one deckhand, and, therefore, the plaintiff had failed to produce evidence of negligence on the part of the employer. *Rutherford* is unpersuasive, however. Because there was no expert testimony in *Rutherford* – as there is here – the case turned in large part on foreseeability. The court concluded that it would not be reasonable to conclude from several minor complaints of sore backs that the defendants knew or should have known that injury could have resulted from one deckhand lifting a steel cable. *Id.* at 397. Here, Green's

---

[8] Keeney also argues that summary judgment is inappropriate under the Jones Act because IBC failed to remove Putty from the M/V WILLARD HAMMOND crew. This question is more appropriately considered under the unseaworthiness doctrine. *See* Section B, *infra*.

testimony makes it clear that there is evidence to raise a substantial question as to whether IBC knew the risks as to one versus two deckhands laying cable. Moreover, in *Rutherford*, there was no evidence that the plaintiff brought the issue of laying cable alone to anyone's attention. The evidence here (deckhands already working in teams, calling for more teamwork) suggests that IBC has been given the opportunity for notice and correction. Indeed, Keeney has testified that he specifically raised the issue of Putty's lack of assistance directly to his captain, who acknowledged that Keeney should be assisted by fellow deckhand Putty.

This may essentially be a dispute between IBC and Keeney's liability expert about various aspects of wire-laying best practices. But simply because a deckhand *could* lay a wire by himself does not resolve for purposes of summary judgment whether that was the non-negligent manner in which IBC *should* have had Keeney carry out that procedure. That will be for a jury to decide. Summary judgment on the Jones Act claim will, therefore, be denied.

**B.     Unseaworthiness**

Under the common law of admiralty, "a ship owner owes to the seaman employed on its vessels an absolute, nondelegable duty to provide a seaworthy vessel." *Daughenbaugh*, 891 F.2d at 1207 n.3 (quoting *Harbin v. Interlake S.S. Co.*, 570 F.2d 99, 103 (6th Cir. 1978)). "A vessel is unseaworthy if the vessel and its appurtenances are not 'reasonably fit for their intended use.'" *Churchwell*, 444 F.3d at 904 (quoting *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960)). "The standard is not perfection, but reasonable fitness," and an owner is not required to provide "an accident-free ship." *Mitchell*, 362 U.S. at 550. This duty is "distinct and separable" from an employer's duty under the Jones Act and requires no finding of negligence. *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 774 (9th Cir. 1981); *see also Perkins*, 246 F.3d at 602 n.6. A

ship owner "is strictly liable for personal injuries caused by his or her vessel's unseaworthiness." *Churchwell*, 444 F.3d at 904. Importantly, "[u]nseaworthiness extends not only to the vessel but to the crew." *Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 727 (1967); *see also Hercules Carriers, Inc. v. Fla. Dep't of Transp.*, 768 F.2d 1558, 1565-66 (citing *Tug Ocean Prince, Inc. v. U. S.*, 584 F.2d 1151, 1155 (2d Cir.1978), *cert. denied*, 440 U.S. 959 (1979) ("Because the shipowner has a non-delegable duty to provide a competent master and crew, unseaworthiness can be caused by insufficient manning of the vessel or an incompetent crew.").

In order to prevail on an unseaworthiness claim, a plaintiff must prove: (1) that a "vessel and its appurtenances were not 'reasonably fit for their intended use'" and (2) that the "vessel's unseaworthy condition was the proximate cause of his or her injuries." *Churchwell*, 444 F.3d at 904 (internal citation omitted); *see also Perkins*, 246 F.3d at 602. Unseaworthiness proximately caused an injury if it "played a substantial part in ... causing the injury" and "the injury was either a direct result or a reasonably probable consequence of unseaworthiness." *Miller*, 989 F.2d at 1463-6 (internal citation omitted). An owner need not have actual or constructive notice of the unseaworthy condition to be liable. *Mitchell*, 362 U.S. at 549. An owner is no less liable for unseaworthy conditions that "aris[e] after the vessel leaves her home port" or for unseaworthy conditions that may be temporary. *Id*. at 568-69; *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498 (1971).

While a close question, the court finds that Keeney has raised a sufficient question of material fact as to the competency of the crew during the October sailing when Keeney claims he was forced to do the work of two men. More specifically, the court finds that Keeney has introduced competent evidence to raise a question about whether's Putty's actions (or inactions)

14

may have contributed to Keeney's injury. Keeney has introduced recorded incidents in which Putty was consistently chastised for the exact type of slacking off that would lead to Keeney's having to lay the wire alone. Moreover, Keeney has testified that he complained about Putty not doing his share of the work on the very voyage that he sustained his injury. Finally, there is evidence that IBC finally fired Putty after years of negative reviews. Keeney should have the opportunity to put to a jury the question of whether the unseaworthiness of the M/V WILLARD HAMMOND'S crew played a substantial part in causing Keeney's injury and, if so, whether that injury was a reasonably probable consequence of that unseaworthiness.

**C.     Maintenance and Cure**

A shipowner's duty to provide maintenance and cure "arises regardless of fault and whether or not employment on the ship actually caused the seaman's injury." *Cunningham v. Interlake S.S. Co.*, 567 F.3d 758, 761 (6th Cir. 2009). Maintenance refers to the shipowner's duty to provide food and lodging while cure is the shipowner's duty to provide medical care and attention "during the period of injury or illness." *Id*. In order to recover for maintenance and cure, Plaintiff must demonstrate that "(1) he was working as a seaman, (2) he became ill or injured while in the vessel's service, and (3) he lost wages or incurred expenditures relating to the treatment of the illness or injury." *West v. Midland Enterprises, Inc.*, 227 F.3d 613, 616 (6th Cir. 2000). Any ambiguities or doubts should be resolved in favor of the plaintiff. *Id*. (quoting *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962)).

IBC argues that Keeney is prohibited from recovering maintenance and cure because he intentionally concealed a preexisting medical condition.

> "[W]here the shipowner requires a seaman to submit to a pre-hiring medical examination or interview and the seaman intentionally

15

> misrepresents or conceals material medical facts, the disclosure of which is plainly desired, then he is not entitled to an award of maintenance and cure. Of course, the defense that a seaman knowingly concealed material medical information will not prevail unless there is a causal link between the pre-existing disability that was concealed and the disability incurred during the voyage."

*Id.* at 617 (quoting *McCorpen v. Cent. Gulf S.S. Corp.*, 396 F.2d 547, 549 (5th Cir. 1968)). Thus, an employer asserting this *McCorpen* defense must establish that (1) the seaman intentionally misrepresented or concealed medical facts, (2) such facts were material, and (3) a causal connection exists between the concealed medical facts and the seaman's injury. *See id.*; *accord Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005).

Here, Keeney suffered a car accident approximately four years prior to his injuries on the M/V WILLARD HAMMOND. He was treated by Vaughn and confessed to burning his arm to relieve his back pain. He was sent for an x-ray, but, upon a clean finding, was released. Later, when applying for a job with IBC, Keeney signed the Medical Submission Form and answered "No" to the questions of whether he had ever had back trouble or any prior injuries to his back, including soft muscle injuries, disc/vertebrae injuries, or neurological injuries. Keeney maintains that this answer was accurate because he was told by Vaughn, that "nothing was wrong with him" after his x-ray results were negative. The first requirement, intentional concealment, is an objective inquiry, which does not look to any subjective analysis, such as reasons for concealment. The court is faced here with a dispute of fact over whether Keeney *ever had* a back injury – as opposed to, for example, any other type of injury – as a result of his car accident. The existing medical evidence – an initial report of pain and a clear x-ray – were

16

contradictory.⁹ Keeney was cleared by his medical practitioner. It is plausible, then, that in 2011, when he filled out his Medical Submission Form, Keeney could have been under the objective impression that he had never had a prior injury to his back. These questions about Keeney's medical history, as well as Keeney's objective understanding of whether he ever had a back injury, are issues for trial.¹⁰

## CONCLUSION

IBC's Motion for Summary Judgment (Docket No. 57 ) will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

⁹ Further in dispute is an admission that Keeney purportedly made to Vaughan in 2013 that his back pain had been going on for 3-4 years. Vaughn does not remember who said this. Keeney denies saying it, and asserts that his father, who suffers from dementia, said it.

¹⁰ This case is distinguishable from *Hare v. Graham Gulf, Inc.*, 22 F. Supp. 3d. 648, 654 (E.D. La. 2014), relied upon by IBC. In *Hare*, the plaintiff had been treated at a family medical practice for back pain from a back injury sustained while doing yard work and had also visited a bone and joint clinic where he was diagnosed with "probable herniated nucleus pulposas" in his back. The defendants also introduced the affidavit of Hare's former father-in-law, who stated that Hare "always complained about having a bad back" and "sought medical treatment over many years for his low back condition." *Id*. at 651, 654.